UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

_____

| | |
|---|---|
| ELIZABETH T. POWERS and NICHOLAS POWERS, ) ) ) | |
| Plaintiffs, ) | |
| v. ) | Case No. 08-CV-2267 |
| ) | |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, ) ) ) | |
| Defendants. ) | |

## OPINION

This case is before the court for ruling on the Motion for Partial Summary Judgment (#39) filed by Plaintiffs, Elizabeth T. Powers (Elizabeth) and Nicholas J. Powers (Nicholas). Defendant Board of Trustees of the University of Illinois (University) has filed a Response (#41) and Plaintiffs have filed a Reply (#42). Following this court's careful review of the arguments of the parties and the documents filed by the parties, Plaintiffs' Motion for Partial Summary Judgment (#39) is DENIED. This case remains scheduled for a final pretrial conference on February 25, 2011 at 11:15 a.m. and a jury trial on March 14, 2011 at 9:00 a.m.

## FACTS[1]

Elizabeth and Nicholas are married to each other. Elizabeth is employed by the University as an associate professor with tenure in the Institute of Government and Public Affairs (IGPA). Nicholas has worked for the University as a research associate in the IGPA. Elizabeth's contract with the University is a nine-month appointment and she receives compensation only for August 15 through May 15 each year.

---

[1] The facts are taken from the statements of undisputed facts provided by the parties and the documents submitted by the parties.

In 2004, the Illinois legislature appropriated $300,000 for the University to conduct a study and analyze state reimbursement levels to community providers of mental health and developmental disability services. The legislation provided that the "study must conclude and be submitted to the House Human Services Appropriations Committee and the Senate Appropriations I Committee by March 31, 2005." In November 2004, Elizabeth agreed to serve as project director of the study. Elizabeth had planned to take a sabbatical during the 2004-2005 academic year but agreed to postpone the sabbatical to the next academic year in order to conduct the study. Nicholas worked on the study as well and was paid $70,000 for work performed from October 16, 2004 to July 15, 2005.

Based upon the submissions of the parties, it appears that a preliminary report was prepared by March 31, 2005, but additional work was necessary for a final version of the report. Elizabeth and Nicholas continued working on the study during the 2005-2006 academic year. It is undisputed that it was not expected that funding for the study by the state would continue after July 31, 2005. On July 1, 2005, Robert Rich took over as the director of the IGPA. A dispute arose between Rich and Plaintiffs regarding payment for the completion of the study. In a letter to Elizabeth dated April 11, 2006, Rich stated:

> [I]t has been more than a year since the preliminary report was published and, as I am sure you know, both the enabling legislation and the scope of work for the project called for a final report to be delivered to the House Human Services Appropriations Committee and the Senate Appropriations I Committee by March 31, 2005. The lateness of the final report is reflecting poorly on the University,

>IGPA, and you.

>I am sure you are aware that, in addition to the $300,000 in state funds made available for this project, IGPA has invested its own resources, including additional salary support for Nick Powers.

Rich concluded the letter by stating the it was his belief that Elizabeth was "failing to meet the terms of [her] obligation to the General Assembly and to the University." Elizabeth provided a lengthy response and, among other things, insisted that she and Nicholas had been assured they would be paid for their additional work on the study. By June 2, 2006, the matter still had not been resolved. Rich wrote a letter to Elizabeth that day and stated that IGPA was prepared to offer Nicholas $13,611.11 for three and one half months of work he devoted to the project and would pay Elizabeth $22,000.

On June 5, 2006, Elizabeth and Nicholas each filed a charge of discrimination with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission. In her charge, Elizabeth claimed that she was the victim of sex discrimination. She claimed that she was subject to "unequal wage" because the compensation for her "trailing spouse" was not equal to the compensation given to a male IGPA faculty member. She also claimed that she had not been compensated for her work on the study and was not paid for work she performed during the summer of 2005 and the 2005-2006 academic year during her sabbatical period. In his charge, Nicholas also claimed that he was the victim of sex discrimination. He claimed that he was employed as a trailing spouse and was "subject to unequal pay continuing through May 2, 2006, in that [he was] denied pay rightfully earned for work [he] completed on a study for the Illinois General Assembly." He claimed that the University did "pay female trailing spouse/partner hires for work performed."

On June 8, 2006, Larry Mann, Executive Assistant Vice President for Academic Affairs at the University, wrote a letter to Elizabeth stating "we need to bring closure to this negotiation." Mann also stated, "[i]f you are unwilling to complete the study under the terms specified in the June 2, 2006, letter, this study will be assigned to someone else to complete." On June 14, 2006, Plaintiffs wrote a letter to Rich and stated that they agreed "on the broad outline of terms" set out in the June 2 letter but insisted that retirement contributions needed to be made to Nicholas' account with the State University Retirement System (SURS). Plaintiffs also made a proposal regarding the allocation of the proposed $22,000 payment to Elizabeth.

On June 16, 2006, Notices of Plaintiffs' charges of discrimination were received by University Counsel. The same day, June 16, 2006, Rich sent a letter to Plaintiffs and stated that, as he had previously stated in the June 2 letter, IGPA was prepared to pay Nicholas a lump sum of $13,611.11, contingent on written documentation of his activities between August 1 and November 15, 2005. Rich stated that no contribution would be made to SURS "because of SURS and university rules." Rich also stated that IGPA would pay Elizabeth $22,000, the equivalent of two summer months salary, for completion of the report, which was to be sent to the printer by July 15. Rich stated that this "is the sum total of the agreement that I am asking you to either accept or reject." Rich asked Plaintiffs to advise him by June 19, 2006, whether they planned to accept the agreement.

Plaintiffs' attorney, John H. Otto, wrote a letter to Rich the same day and stated that he had been retained by Plaintiffs "in connection with their attempt to be compensated for work they have performed and will perform for [IGPA]." Otto disagreed with Rich regarding the issue of SURS contributions and stated that "SURS rules should not prohibit [Nicholas'] participation from August

4

1, 2005 to mid-November, 2005." Otto also stated that Rich's proposal may be discriminatory and urged him to "work with [Plaintiffs] in order to get accomplished what you all desire: To get the study done and to fairly compensate the persons doing it."

On June19, 2006, Plaintiffs sent a letter to Rich and noted that Rich had not responded to Otto's letter. Plaintiffs then stated, "[s]ince we have no recourse, we accept the terms outlined in your June 16th 2006 letter under protest. We reserve all of our rights to pursue our claims in all other forums." On June 20, 2006, Rich responded to Otto's June 16 letter and stated that they were prepared to recommend a four-month half-time appointment for Nicholas which would provide him with $15,555,58 in salary and normal SURS contributions. Rich ended the letter by stating, "I am hopeful that we can reach an agreement in the very near future." On June 21, 2006, Elizabeth sent an email to Rich and stated "Nick and I are pleased that the end to these negotiations is again in sight. Our counsel and University's counsel will hammer out the details."

Subsequently, Otto and Laura D. Clower, Associate University Counsel, had discussions and exchanged emails regarding the terms of the agreement. On July 7, 2006, Clower sent Otto a proposed settlement agreement. The agreement provided for payment to Elizabeth of $22,000 and payment to Nicholas in the amount of $15,555,58, with applicable contributions to the SURS. The proposed settlement agreement also provided that Plaintiffs would dismiss any and all claims against the University in any forum. The proposed agreement also provided that Plaintiffs agreed that they would not sue the University or file any complaint, claim or charge against the University based on any conduct "occurring up to and including the date of the full execution of this Agreement." The proposed agreement then provided a non-exclusive list of potential causes of action covered by the agreement not to sue.

5

Otto sent Clower a response by email the same day. He stated:

> I envision several sticking points with respect to your draft of a proposed agreement. I think it goes beyond anything we had discussed or agreed to in terms of the Powers giving up any rights to proceed with their IDHR claim or giving assistance to others in making such claims or non-disparagement. I think I told you that if everything else gets worked out, I think the IDHR claim will go away, but you have added a bunch of additional waiver of claims that goes far beyond a simple dismissal of the IDHR claim.

Otto also raised other issues regarding the proposed settlement and said he would send a draft of the settlement agreement with the changes he was proposing. Clower responded by email about 45 minutes later and stated "if the Powers aren't willing to resolve this dispute (i.e., they want NOT to release any and all claims related to this matter) that's a deal breaker–a settlement that doesn't settle a dispute isn't a settlement."

Otto and Clower communicated by email for the next few weeks but Plaintiffs did not sign a settlement agreement and the University did not make any payment to Plaintiffs regarding their claim for additional compensation for work performed on the study. It is undisputed that the University determined not to pay Plaintiffs for the work they had performed on the study until all issues resolving all of the controversies with the University had been resolved.

PROCEDURAL HISTORY

On October 4, 2007, Plaintiffs filed a Complaint in Case No. 07-CV-2183 against the University and Rich. No action was taken by Plaintiffs and the case was dismissed on April 10,

2008.

On November 4, 2008, Plaintiffs filed their Complaint (#1) in this case against the University. On May 13, 2009, this court entered an Order (#7) and denied the University's Motion to Dismiss. This court determined that the dismissal of Case No. 07-CV-2183 was a dismissal without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. Therefore, this court concluded that the University's argument that Plaintiffs' Complaint was barred by res judicata had no merit.

In their Complaint (#1) against the University, Plaintiffs alleged 10 Counts. In Count I, Plaintiffs alleged that the University paid Elizabeth wages at a rate less than it paid to a male employee for equal work in violation of the Federal Equal Pay Act, 29 U.S.C. § 206(d). In Count II, Plaintiffs alleged that Nicholas, as a male trailing spouse, was not paid for work he performed for the University at the request of Rich, in violation of the Federal Equal Pay Act, 29 U.S.C. § 206(d). In Count III, Plaintiffs alleged that Elizabeth was entitled to recover for retaliation under the Federal Equal Pay Act. In pertinent part, Plaintiffs alleged that Elizabeth opposed the unlawful acts of the University in discriminating against Plaintiffs because of sex and, in retaliation for such opposition, the University "refused to pay her for work she had performed in behalf of [IGPA], and for which [IGPA] had agreed to pay her, unless she withdrew her charges of discrimination and agreed not to file any further charges." In Count IV, Plaintiffs alleged that Nicholas was entitled to recover for retaliation under the Federal Equal Pay Act. In pertinent part, Plaintiffs alleged that Nicholas opposed the unlawful acts of the University in discriminating against Plaintiffs because of sex and, in retaliation for such opposition, the University "refused to pay him for work he had performed in behalf of [IGPA], and for which [IGPA] had agreed to pay him, unless he withdrew his charges of discrimination and agreed not to file any further charges." In Counts V and VI, Plaintiffs alleged that

7

the University's failure to pay them for the work they performed violated the Illinois Minimum Wage Law, 820 Ill. Comp. Stat. 105/1 et seq. In Counts VII and VIII, Plaintiffs alleged violations of the Illinois Equal Pay Act of 2003, 820 Ill Comp. Stat. 112/10. In Count IX and X, Plaintiffs alleged that they opposed the unlawful acts of the University in discriminating against them because of their sex and, in retaliation, the University refused to pay them for work they performed on behalf of IGPA unless they withdrew their charges of discrimination and agreed not to file further charges.

On June 2, 2009, the University filed its Answer (#8) to the Complaint, denying many of Plaintiffs' allegations. The University also raised several affirmative defenses, including its assertion that Plaintiffs' claims under the Federal Equal Pay Act are barred by the statute of limitations.

On November 1, 2010, Plaintiffs filed a Motion for Partial Summary Judgment (#39). Plaintiffs argued that they are entitled to summary judgment on Counts III, IV, V, VI, IX and X of their Complaint. Plaintiffs claimed there is no genuine issue of material fact, and they are entitled to judgment as a matter of law, on their retaliation claims and their claims under the Illinois Minimum Wage Law. Plaintiffs attached documentation in support of their Motion. On November 29, 2010, the University filed a Response to Motion for Partial Summary Judgment (#41) and provided additional documentation. Plaintiffs filed a Reply (#42) with attached documentation on December 13, 2010.

## ANALYSIS

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary

8

judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002).

In order to be entitled to summary judgment on six of their claims, Plaintiffs must establish they are entitled to judgment on their claims as a matter of law by showing there is no material dispute of fact as to every one of the elements of the cause of action asserted in those claims. This is a difficult burden for a plaintiff to meet. See, e.g., Creative Trade Group, Inc. v. Int'l Trade Alliance, Inc., 2009 WL 3713345 (N.D. Ill. 2009). As Plaintiffs are the parties requesting summary judgment, they have the ultimate burden of persuasion to demonstrate they are entitled to judgment as a matter of law. See Creative Trade Group, Inc., 2009 WL 3713345, at *6, citing Raymond v. Ameritech Corp., 442 F.3d 600, 608 (7th Cir. 2006). "Summary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999); see also Frobose v. Am. Sav. & Loan Ass'n of Danville, 152 F.3d 602, 615 (7th Cir. 1998) (recognizing that questions of intent and credibility make it difficult to grant summary judgment in favor of the party with the burden of proof).

RETALIATION CLAIMS

Plaintiffs argue that they are entitled to summary judgment on all four of their retaliation claims and argue that they have direct evidence of retaliation. Under the direct method of

9

establishing a case of unlawful retaliation, Plaintiffs must prove three elements: (1) they engaged in statutorily protected expression; (2) they suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. See Culver v. Gorman & Co., 416 F.3d 540, 545 (7th Cir. 2005); Wilke v. Salamone, 404 F. Supp. 2d 1040, 1046 (N.D. Ill. 2005). "A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision. Culver, 416 F.3d at 545, citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Plaintiffs contend that the "refusal by the [University] to pay the agreed-upon wage unless the Plaintiffs signed a release is unambiguously retaliation for the Plaintiffs' assertion of their statutory rights to assert that [the University] had violated the federal and state Equal Pay Acts." Plaintiffs cited no authority in support of this argument that they are entitled to judgment as a matter of law on their retaliation claims.

In response, the University pointed out that Plaintiffs were fully paid under the initial agreement for Plaintiffs to perform work on the study, which was to be completed by March 31, 2005. Plaintiffs did not complete the project by that date and demanded additional payment for time spent on the study. The University argued that it attempted to resolve the dispute with Plaintiffs but settlement negotiations reached an impasse when the terms of the proposed settlement could not be agreed upon. The University argued that the evidence shows that "reasonable minds could differ as to the import of the documents, pleadings and depositions that are before the court and that a fact finder could resolve this case in favor of either party."

In ruling on Plaintiffs' Motion for Partial Summary Judgment, this court must construe the

10

evidence in the light most favorable to the nonmoving party, the University, and draw all reasonable inferences in favor of the University. This court concludes that a reasonable inference can clearly be made in this case that Rich and the University were trying to negotiate a settlement agreement which would completely resolve the ongoing dispute with Plaintiffs regarding the work Plaintiffs performed on the study following the date the study was supposed to be completed. Therefore, a reasonable inference can be made that Rich's letter dated June 16, 2006, was an offer to settle the entire dispute, which Plaintiffs never accepted. The evidence shows that Plaintiffs' counsel wrote a letter on June 16, 2006, and suggested different terms, some of which actually were included in the proposed settlement agreement provided to Plaintiffs on July 7, 2006. In addition, an inference can be made that Plaintiffs' purported acceptance on June 19, 2006, included additional terms (that they reserved their rights to pursue their claims in all other forums) and was not effective to accept the terms offered by Rich. Plaintiffs' June 19, 2006, letter showed that they were unwilling to dismiss their charge of discrimination which, to a large extent, related to the dispute over payment for work Plaintiffs performed on the study. It is also reasonable to infer that the University included standard release of claims terms in its proposed settlement agreement in an attempt to resolve all of the disputes between the University and Plaintiffs. A reasonable inference can be made from the evidence that no settlement agreement was ever reached between the parties and no payment was made to Plaintiffs for that reason. This court therefore agrees with the University that a genuine dispute regarding Plaintiffs' retaliation claims exists and the claims must proceed to trial.

## II. MINIMUM WAGE LAW CLAIMS

Plaintiffs argue that there is no dispute that they completed work on the study for which the University has not paid them. They therefore argue that they are entitled to summary judgment on

11

their Minimum Wage Law claims in Counts V and VI. In their Reply, Plaintiffs appear to be arguing that, by offering to pay them in Rich's June 16, 2006, letter, the University "conceded" that Plaintiffs were owed wages for work performed. This court does not agree.

This court has already concluded that Rich's letter could reasonably be interpreted as an attempt to settle the dispute regarding whether Plaintiffs were entitled to additional pay for their work on the study. Therefore, this court cannot conclude, as a matter of law, that the University violated the Minimum Wage Law by failing to pay them. In fact, in their Reply, Plaintiffs acknowledged that "a fact issue remains as to the issue of whether the Plaintiffs worked on the mandated study without pay." Plaintiffs argued that "[w]hether the Plaintiffs worked or did not work on the mandated study without pay remains to be determined at trial" on Counts I, II, VII and VIII. This court concludes that the same is true regarding Counts V and VI.

### III. CONCLUSION

Plaintiffs will have the opportunity to present all of their claims to a jury, but they are not entitled to summary judgment on any of their claims.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiffs' Motion for Partial Summary Judgment (#39) is DENIED.

(2) This case remains scheduled for a final pretrial conference on February 25, 2011 at 11:15 a.m. and a jury trial on March 14, 2011 at 9:00 a.m.

ENTERED this 8th day of February, 2011

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE